Good morning. We have four cases on the docket this morning. Two will be considered, submitted on the briefs. The first case is United States v. Abdeljawad, case number 182121, and we'll hear from Mr. Ward. May it please the court. My name is Vincent Ward, and it is a privilege to appear before you on behalf of Mr. Abdeljawad. I will be reserving some time at the end of my argument or rebuttal. Can you just pull that a little? We can hear you fine, but the recording needs... You got it, Your Honor. I will address three issues related to the trial court's erroneous interpretation of section 2D11 of the sentencing guidelines when it multiplied the weight of the synthetic marijuana by 167 when determining Mr. Abdeljawad's base level offense. The first issue, members of the court, is that note six and eight, application notes six and eight support the conclusion that inert plant material should be considered with respect to a THC related analog. The second issue I will address is that the government's own expert did not provide helpful opinions to inform the court's consideration of how the synthetic marijuana should be treated. And the third issue that I will address is what are the available remedies to the court in this situation. As a preliminary matter, this case is a one-of-one. The sentencing guidelines have changed, and the sentencing guidelines have now made clear what the treatment of synthetic marijuana is. At the time that Mr. Abdeljawad was sentenced, that was not the case. The prevailing case law, another important point, is that what little prevailing case law existed supported and supports the government's interpretation of what should happen. Our argument, however, relies on Judge Bright's dissent in the Ramos case. I want to point out, though, that Judge Bright in the Ramos case did not have the benefit of the information that you will have, which is to discuss the expert's actual findings in this particular case. That was very fact intensive. When you look at notes 6 and 8, the application notes 6 and 8, note 6 dictates what the court should do when you have an unlisted controlled substance. There's a three-part test. And the two parts that are relevant to this court's consideration are paragraphs B and C. B deals with the question of whether the unlisted THC analog has a substantially similar effect on the central nervous system as one of the listed controlled substances. C, on the other hand, deals with whether or not it would take greater or lesser quantity of that unlisted controlled substance to create a substantially similar effect. Note 8, on the other hand, deals with the specific question of what to do with a THC-related drug. THC, as you know, comes in various forms. And what the commentary note 8 describes is essentially a sliding scale from- But, okay, and we understand your argument, you know, in the briefs on that point. But can I ask you this? There's a sliding scale, hashish, marijuana. But in district court, as I understand it, you pick marijuana. And so whether or not hashish or some other controlled substance that contains THC as a psychoactive ingredient really seems immaterial if the question is whether or not marijuana is the closest analog. Right. I understand your point, Your Honor. At the trial level, at the sentencing level, marijuana was picked because that's how Judge Bright interpreted what should happen. At the trial court level, the only evidence that came in consisted of information that existed out of the Ramos case and then information that was presented from the government's expert. And the whole point was to focus on this question of potency. And the reason at the trial court phase the defense went that direction was because of problems with the expert's analysis and this question of potency. And so moving to my second point, which I think really goes to your issue, if you look at Dr. Trecky's opinions, there are three really interesting points that you should focus on. The first is that he didn't ever actually test and provided no opinions as to how much synthetic marijuana was actually applied to the inert plant material. Why is that significant? Well, it's relevant because what Note 6 explains for us to do, for the court to do, is to look at potency considerations. And so in this case, the expert wasn't able to provide any opinions as to potency as it relates to inert plant material because he never actually conducted or performed a test related to that. So where did it come from? Well, what he's relying on, Dr. Trecky's opinions are basically that synthetic marijuana is very bad, that it has adverse effects, and that there was a rodent study that was done that had these adverse effects. Well, to one of my points about the expert examination here, that rodent study dealt with the comparison of pure THC to pure synthetic marijuana. Inert plant material wasn't actually ever considered. The other point is that because Dr. Trecky was having to extrapolate since he hadn't ever done any testing in this particular case, he conceded in the record that he couldn't give any testimony about what amount of synthetic marijuana is typically applied to the plant material. Can I ask you a question? And I'm sorry to break up your train of thought. Please, Your Honor. But both of those points with regard to Dr. Trecky's testimony and the inferences that you're drawing from that, you keep referring to synthetic marijuana. Isn't the decision going to turn on whether or not we should even be considering synthetic marijuana or synthetic cannabinoids? B, as I understand it, is to compare the unlisted controlled substance. And synthetic marijuana is not an unlisted controlled substance. The unlisted controlled substance is synthetic cannabinoid. Right, Your Honor. And you compare that to the effect of a listed controlled substance. You pick marijuana in district court for whatever reason. Right. And they pick THC. And so why should we even be considering inert plant material because the inert plant material is not a component of synthetic cannabinoids. It's a component of synthetic marijuana. So in this case, the question before you, though, is whether or not the inert plant material should have been considered by the court. Why is that the question before us? If you look at note six, it tells us to look at the controlled substances and take the controlled substance and compare it to the closest. Here, the controlled substance, as my colleague has pointed out, doesn't include inert plant material. They could have included it, but they didn't. So all we have is the synthetic cannabinoids, which seems to me that the court made a pretty logical comparison here to the THC. And that's why Judge Bright's discussion of looking at the sentencing guidelines as a whole when it comes to THC is so important. So if you look at Judge Bright's analysis, he discusses this point that THC is different with the way that it's treated under the guidelines. And THC, the sliding scale approach is dictated very much by how much inert plant material is contained. So for example, if you have marijuana, which is explicitly in the guidelines, considers the fact that it has more inert plant material than pure THC, which pure THC contains no plant material whatsoever. So what Judge Bright was talking about, I think it's very logical actually, is that the court should consider inert plant material at the stage when it's considering paragraphs B and C. So Judge Bright's explanation would reflect, I think you're saying, essentially an absurdity in what the district court did, right? I would say I wouldn't want to call the district court doing something absurd, but I think it was wrong. I think it was wrong in that it didn't consider the presence of inert plant material and its expert had not considered it at all. And so you're saying that we, so we look at the sentencing guidelines as a whole, THC has this unique facet, but isn't the $64,000 question is, which you alluded to just a few minutes ago, and that is the sentencing commission, because this is a one-off, the sentencing commission must not have thought it's too absurd or that it is not inconsistent with the entirety of the way that the sentencing guidelines work, because the sentencing commission ultimately said it is a 167 to one ratio. How do you, why does that not undercut or undermine your point about the sentencing guidelines as a whole? Three quick points, and then I want to reserve some rebuttal time. The first point is that it wasn't clear at the time when Mr. Abdel-Jawad was sentenced. So to me, when the sentencing commission is doing something later, it's reflective of this point that there was a lack of clarity. It needed to come in and make a point of clarity. The second is that the rule of lenity actually matters. And in my mind, the rule of lenity dictates that when you have something that is unclear, that it's not the government that should benefit from that lack of clarity, it's the defendant. And in this case, remember, Mr. Abdel-Jawad was sentenced to over 10 years of confinement. The third point that I would say, and it goes to the remedy, and I'd like to talk about that later, is that the logical remedy here is to remand back to the district court so that the information that Dr. Trekkie was unable to address could be addressed at the trial court level. I'd like to reserve the remainder of my time for rebuttal. Thank you, counsel. Good morning, Your Honors, Judges Bacharach, Seymour, and Judge McHugh. My name's Christopher Houghton. I'm an assistant United States attorney out of the District of New Mexico. May it please the court. The defendant's sole argument in this case, as the court's noted, is a legal one about whether or not under application note six, when the court looks at subsection B and C, the court should be applying controlled substances as it's used throughout the guidelines and throughout the statute, as case law has acknowledged, just to mean the actual controlled substances. In other words, in this case, the actual chemical synthetic cannabinoids, or to use controlled substances to mean controlled substances plus inert material. That position is at odds, as I've said, with the way the rest of the guidelines use controlled substances. It's at odds with the way the statute uses it. It's at odds with scores of district courts that have considered the issue, and every circuit court to have come close to considering this issue. Would you back up a minute and explain to me how this works? If this stuff is sprayed on something, so how does the government figure out how much is there? Your Honor, we don't. Under the guidelines, nothing requires a district court to have an expert testify about potency or purity. When the guideline wants the government to do that, it specifically carves those out. So for PCP, methamphetamine, and amphetamine, those parts of the guidelines have a parentheses and say actual. So how do you know how many grams of synthetic cannabinoid there if it's sprayed on something? So that's step two. Step one is really to go through application note six and determine what controlled substance it's most like that is listed. And step two is to then multiply whatever the weight of the synthetic cannabinoid is plus material that it's on, like you do for the rest of the guidelines, by the ratio provided in the equation table, which is on note eight. So note eight has what's counsel referred to as marijuana. I'm still confused. If it's sprayed onto something, how do you figure out how many grams of what is sprayed on? You weigh the entire substance. So you weigh the inert material plus the controlled substance that's been impregnated into the leaves. So the weight that you use is the weight of the controlled substance. And that approach is consistent with the way we deal with virtually all controlled substances. You're talking about the weight includes the plant material. That's correct, Your Honor. And I can point the court to several places where the sentencing guideline or why the sentencing guideline takes that approach. First of all, in statute. So the reason why methamphetamine and amphetamine and PCP are carved out in that way is because the guidelines are taking cues from statute where there is a difference in the statute. And there's a note of actual methamphetamine, which is punished differently under the code than a mixture in substance containing it. Virtually all controlled substances, though, apart from those carved out controlled substances, are treated the same. And I point the court to a recent 11th Circuit case. I believe it's United States versus Abu hyphen Aish. That case. Can you give us the site? I think I do have it, Your Honor. Is this one that's not in your brief? Correct, Your Honor. This one is 758 Federal Appendix 798. And it's 11th Circuit case from 2018. The pin site is 802 through 804. The 11th Circuit approached a similar issue, whether or not to consider the mixture in substance, the inert material, and the controlled substance when weighing it. And it cited back to Chapman versus United States, which talks about a market-oriented approach. And it said that Congress adopted a market-oriented approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence. It intended the penalties for drug trafficking to be graduated according to the weight of the drugs, in whatever form they were found, cut or uncut, pure or impure, ready for wholesale, ready for distribution. And the 11th Circuit noted that Congress didn't want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure substance. And that was because traffickers keep the street market going. And so this was something that the United States Supreme Court derived from Congress's statutes here. And this is the approach that the guidelines direct for us to follow. And so when the district court judge- Let me interrupt for a minute. You say that that is the approach. And yet, with respect to THC, that's not how it's done, right? It does graduate from hashish to marijuana to THC, or I've got them out of order, but right? Not exactly. We cited a case out of the Fifth Circuit that talked about THC. And in that case, it's in my answer brief. I don't have it at my fingertips here. But in that case, there was a mixture in substance that included THC. And what the court did there is didn't require the government to find out the amount of THC in the mixture. And it talked about the same approach, which is that you weigh the entire amount. But if we could call it hashish, or if we could call it marijuana, the plant material, the defendant would be treated differently than pure THC, correct? That's true. If, in fact, the controlled substance at issue was more like, in the opinion of an expert, or whatever facts that the district court was relying on, more like hashish, then you would use that ratio. If it was more like marijuana, you would use that ratio. But my point is you're saying that we treat the synthetic cannabinoids the same, regardless of the potency, because that's what Congress intended. And that's what the guidelines do. And yet, that really isn't what the guidelines do with respect to THC, because it breaks it out depending on whether you've got pure THC, whether you have hashish, or whether you have a plant, a marijuana plant. That is sort of true in a way. But let me point the court to this part of the record, which is that marijuana, hashish, resin, and THC, as contemplated in that table, and is kind of oversimplified by the defense, is contemplating THC in the context of its actual natural form in marijuana. Which the expert, in this case, Dr. Trekkie, testified in the record that the synthetic cannabinoids here, as opposed to those substances, are sprayed on inert material. And so part of his testimony in the record was that you can't compare, even when a synthetic cannabinoid is sprayed on inert material, you cannot compare that to marijuana. One of the reasons, he said, is because marijuana has about 300 different chemicals in it, some of which actually regulate the THC. So you can't compare those things one-to-one as the defense wants to do. His testimony was, and the district court found this. I think you'll find that at, so the testimony he was relying on is at Record of Appeal 111, in which Dr. Trekkie says it's not comparable to marijuana. Even when you're looking at the inert material. 139, in which he testified about a case where a boy took one hit from a joint rolled up with synthetic cannabinoid product, and it resulted in his death. And at Record of Appeal 147, in which he restates that it's not comparable to marijuana in that way, his rationale was because marijuana has all those regulating chemicals, which synthetic cannabinoids do not. Can I just ask you, because I just want to make sure I'm following. Is that because you're saying that the synthetic cannabinoid, when it is sprayed onto inert plant material, the inert plant material has no effect in diluting the effect of the synthetic cannabinoid, whereas with marijuana, the THC does. Is that? That's correct. Okay. And that was Dr. Trekkie's testimony. But that's the point you're making now. Yes, Your Honor, which is to contradict this argument the defense is making that the table that you see in Note 8 is reflective of THC, purity THC. That's not altogether the whole story. The whole story is it's THC, but it's also these regulating chemicals you see in resin or marijuana, as opposed to when these man-made chemicals that are supposed to hit the same receptor THC does is sprayed on inert plant material that doesn't have the regulating effect. So that was the point I was making, Your Honor. Are you moving on to another subject? Because I don't want to interrupt you. I would love to answer your question, Your Honor. Well, so my question is, I guess it would be equally applicable to both of you. It's how, you know, we are addressing a question of law. You know, the regime of the sentencing guidelines prior to this change, and both sides are relying understandably and quite reasonably on Dr. Trekkie's testimony from these other cases. Does that mean that we make a decision here in analyzing Dr. Trekkie's testimony and we say either the defendant wins or the government wins, but this is just only because of this testimony that Dr. Trekkie had provided? So in the next case that may involve a sentence that was imposed prior to the new change in the sentencing guidelines, if there's other expert testimony, this case would have no effect on that? In other words, how do we weigh the fact that both sides are relying on expert testimony when understandably, but it is ultimately a question of law that we have to decide? The expert testimony comes in to support the findings under B and C, and so what we did below is to admit the testimony and reports of Dr. Trekkie into the record with agreement of defense counsel. That was what the district court relied on when he made the determination under B and C. That's not being challenged here, those findings. I think the only thing that's being challenged is whether when he did that comparison, did he appropriately define controlled substances in B and C to mean just the synthetic cannabinoid chemical, or was he required at that point to consider synthetic cannabinoid properties? So fair point. So it's a pure question of law? A pure question of law, I think the parties agree. All right. And so for that reason, the United States points the court to the rest of the guidelines, which make clear that controlled substances means the actual regulated ones, just as the majority in the Ramos case explained when it had to answer Judge Bright's dissent. It said that this argument runs afoul of the plain text of the guidelines manual. When cases involve controlled substances not specifically referenced in the drug equivalency table, comment six tells the court to compare, quote, the controlled substances not referenced. Here the record makes clear the controlled substances at issue were the synthetic cannabinoids. And so that very rationale is what the United States is asking this court to rule in this case on that very discreet, narrow legal issue. And I will note, before my time runs out, I've got about two minutes, the new sentencing guidelines make clear that that was what was intended all along. If the court looks at the, there's a document that the Sentencing Commission puts out that explains the rationale for the amendments. If you look at pages 21 and then 26 through 27 of those amendments, you'll see the rationale of why they made it even more clear that synthetic cannabinoids should be compared to THC on a 1 to 167 basis. Why doesn't that support his argument that the rule of lenity should apply here? If it wasn't clear before and had to be made clear, shouldn't the defendant have the benefit of that? If you look at the amendments in that rationale there, you will see their explanation isn't because it was confusing or to make it more clear. What they were trying to prevent, it seems, is district courts from having to hear the expert testimony go through the comparison of B and C because it was so time consuming. And so they put in there for precision, but also just for ease of use of the guidelines. Because what was happening is in every one of these cases, Dr. Trecky was having to fly around the country and give the exact same testimony. And so what the guidelines were really saying is, we don't need to hear this testimony in every single district court case anymore. We're just going to say it for once and for all. And that's because the data supports it. 1 to 167 is the appropriate . . . . . . And how did Dr. Trecky figure out this? He used . . . I've got about 20 seconds, Your Honor, if I can answer a little longer. He used in vitro testing and in vivo testing on animals. And, of course, he couldn't test these controlled substances on people because it was too dangerous. So he used those two things. And he used case studies of the overdoses that were occurring around the country to determine what these synthetic cannabinoids were most like. And so really that's the only determination he was making. How does that get to the ratio, just to determine it's most like marijuana? His work was not to determine what the ratio should be. His work was really to determine what the synthetic cannabinoids were most like. And as a policy decision, the Sentencing Commission, they were the ones that came up with the 1 to 167 ratio. And how did they do that? What's the basis of that? I believe it's based on the risk that they perceived to be posed. And so they were trying to punish certain controlled substances with respect to the risk posed. So they were said, this is obviously much worse than marijuana because one puff can kill you. So we'll pick 1 to 167? That's correct, Your Honor. Did you see my? I did see your finger in there, Your Honor. The amendments for the new sentencing guidelines don't go into the science behind it. But that's the policy decision that they made with the data that they had. I don't know exactly how mathematically they came up with the 1 to 167 ratio. Will you indulge me? Sure. That's the same as for THC, right? That's correct, Your Honor. So they may have just said, just use the same. And that's probably because, and this is in the record, that THC was determined by Dr. Trekkie to be as potent as synthetic cannabinoids. And in most cases, synthetic cannabinoids were many times more potent than THC. And that is reflected in the amendment to the sentencing commission. Thank you, Your Honors. Thank you. Did you? No. Let's say I had 1 minute and 55 seconds to the appellate, to be fair. And before you start, can I ask appellate's counsel, you referred to 11th Circuit opinion that was not cited in the brief. So could I ask you a favor? Within five business days, can you submit a 28-J letter, giving us what you just said on the record? I'm happy to do that, Your Honor. Of the site. Of course. I don't mean that you have to repeat your argument, but just give us that site. I will do so. Thanks. Thank you, Your Honor. I'd like to pick up on the new guidelines, which came up during the government's argument. One of the fundamental problems in this case is you have no testing whatsoever of the actual drugs that are at issue, other than to determine that they're synthetic cannabinoids. If you look at the new guidelines, it envisions that the government is required to test so that you can make a determination as to what the impact of the inert plant material is. Each time. Each time, Your Honor. Each time. Each time. And the reason I say that is, when you look at application note 27A in the new sentencing guideline, it says very specifically that there also may be cases in which the substance involved in the offense is a mixture containing a synthetic cannabinoid diluted with an unusually high quantity of base material. And I think what that's reflecting is that, obviously from the government's argument, it operated from this presumption that the guidelines and the quantity tables didn't require it to do any particular testing. Is testing of impurity? For that particular drug that's at issue. So for example, Your Honor, you could have an absurd result. You could have one spray of the synthetic cannabinoid on kilograms of base material. And under the government's argument, you end up in the exact same place because you're only really looking at total quantity. Well, what if you have 200 pounds of marijuana and the potency is so minuscule, there's just a little bit of THC. But the defendant, regardless of this, on just marijuana, would be responsible for the 200 pounds of marijuana. And it would be the same as if there was 10 pounds of marijuana with a very high potency. A few things on that, Your Honor. The first is that because marijuana is already studied and they knew about it, they were able to extrapolate and make some sort of educated assessment about how much quantity of marijuana should be used as part of a sentence. Remember here, the synthetic cannabinoid is a new thing. And when the government started this movement of prosecuting people, it really hadn't done the scientific work to understand it. Other than, as the government pointed out, they thought that there were serious effects associated with synthetic cannabinoids, right? But this is the United States of America. And they have the resources and the ability to conduct the testing so that they know how to treat it. And what offends me about the way this case was handled is that there not only wasn't an attempt to test the actual drugs that are issued in this case, there's a presumption that it's not even necessary to do that. And my point is, if you look at the new guidelines, the new guidelines are envisioning that there's going to be some sort of consideration for the inert plant material. Well, but all through the guidelines in terms of quantity, which I think you're getting a little confused with, identifying the drug that is the closest. But we look at a mixture and you weigh it and you get the weight of the mixture. That's right. And this, what you're talking about, is a mixture. It is a mixture, except, OK, so a few things there. The tables, the quantity tables that the government is referencing explicitly address weight as an issue. So when you look at quantity tables E and I and H as they deal with hashish and marijuana and all of those things, there's an explicit discussion of what is the impact of weight. And, for example, when it talks about hashish, it talks about that there's less plant material. So as you go through that sliding scale, there's less plant material. And you see that explicitly in E, H, and I. Well, and they could have had a correlation so that you had synthetic cannabinoids listed as a controlled substance and you also had potpourri or bath salts or plants sprayed with cannabinoids. But they didn't do that. So it seems to me you're confusing step one with step two. And step two is where we look at the weight. And the guidelines are very clear that, if it's a mixture, you're hit with the entire weight of your mixed substance. Do you disagree with that? I do, Your Honor, and I think I'm just about out of time here. You can answer whatever questions, if I can. Your Honor, I do respectfully disagree. And there are three parts to my answer, if I could do that, OK? The first one is that our position comes from a place where inert plant material should inherently be considered. Step two, at this point, the guidelines didn't reflect what to do where you have synthetic cannabinoids. This was that period of time when we had to guess as to what to do or make an informed decision. The third point is that testing actually matters. And I think going to the remedy that's available to you for this one-of-one case is to remand this case back to the trial court so the government can be as compelled to conduct the testing so that we can actually consider the impact of the inert plant material and do what Dr. Trekkie admitted that he didn't do when he gave his opinions. Well, let me follow up. So, and it pertains a little bit to what Appellee's counsel referred to in identifying the legal issue. If the legal issue is simply, do we consider the inert plant material or do we not, which I think is consistent with the way you've identified the issue, then whether or not there should be additional testing really wouldn't pertain to the pure legal issue of do we consider the inert plant material in terms of considering the unlisted control substance or do we not, right? So, how does additional testing impact this pure legal issue? Right. I think that there is a factual question that's underpinning the legal question that you have to decide. And I think that the legal question that's before you is, was the district court correct that he wasn't supposed to consider inert plant material because of the terms controlled substances, which is the point that Judge McHugh has been getting to, has been going to. And our point is, Judge Bright makes a very compelling argument. And in this one-of-one case, his compelling argument is that inert plant material should, in fact, be considered. That's the legal question that needs to be decided. And all of it is dictated on this question of what is the impact of that inert plant material in this particular case so that the sentence is fair and just. Thank you. Do you have any more questions? Thank you, counsel. This matter will be submitted. Just an editorial comment. I thought the briefing in both sides was absolutely stellar. And your oral advocacy today was on par with your written work. And we appreciate the excellent advocacy of both counsels.